# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| PATRICIA L. ZAJAC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CV-35 PS |
| | ) | |
| MITTAL STEEL USA, a For-Profit Corporation | ) | |
| f/k/a MITTAL STEEL USA ISG, INC., f/k/a ISG | ) | |
| BURNS HARBOR LLC, and ISG BURNS | ) | |
| HARBOR LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Patricia Zajac was sexually harassed by two of her co-workers at Defendant ISG Burns Harbor, LLC. The harassment occurred both on and off of the worksite, even at her home. Fed up with the union's inability to alleviate the harassment, Zajac asked to be transferred to a different area of the mill. Her request was ultimately granted, but before she moved, the harassment continued. It got so bad she obtained a protective order against the two men. At that point, ISG became aware of the situation and intervened. The two employees were disciplined and Zajac was transferred pursuant to her request. But Zajac's problems did not go away. Working in new areas, Zajac encountered new difficulties. Some related to Zajac's inability to meet her supervisors' standards, some related to their refusal to place her in positions she thought she deserved, and some were manifestations of her co-workers' spite. Zajac interpreted all of them as sexual harassment and retaliation for her previous complaints. Much of this time, she was physically ill and absolutely dreaded going to work.

Given the record before me and the severity of the harassment Zajac endured, I find that there are genuine issues of material fact concerning the reasonableness of ISG's response.

Therefore, ISG's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

ISG is a steel manufacturer that employs approximately 4,000 workers.[1] (DE 39-2 at 1.) ISG maintains a company policy prohibiting sexual harassment, and directing any employee who feels he or she has been sexually harassed to report the conduct to the company. (*Id*. at 1-2.) The Burns Harbor Facility, where Zajac worked, also had specific Rules of Conduct prohibiting sexual harassment. (*Id*. at 2.) Both the company policy and the Rules of Conduct provide that those who engage in sexual harassment will be subject to discipline, including termination. (*Id*. at 1-2.) In addition, ISG and the union to which many of its employees belong, conducts harassment training programs. (*Id*. at 2.) One such training even occurred during the time when Zajac was being harassed. (*Id*.)

Zajac started working for ISG in May 2003 after a lengthy stint at ISG's predecessor, Bethlehem Steel. (*See* DE 41-1 at 2.) The record does not indicate that Zajac has ever had any disciplinary problems throughout the more than ten years she has worked for Bethlehem and ISG. She first began experiencing harassment in the fall of 2004, while working in the Plate Mill section of the Burns Harbor facility. (DE 41-2 at 2.) So that's where I pick up the story.

The origin of the relationship between Zajac and Carl Qualkenbush, one of her co-workers in the Plate Mill, is unclear. What is clear is that Qualkenbush began sexually harassing Zajac no later than November 2004. (*See id*.) He started by making lewd comments to her, such as offering her $1,000 to allow him to perform oral sex on her and asking if she had ever seen an uncircumcised penis. (*See* DE 41-1 at 2-3.) Between November 2004 and February 14, 2005, he

_____

[1] ISG's name changed to ArcelorMittal Burns Harbor, LLC after Zajac filed this suit.

gave her four or five sexually explicit greeting cards. (*Id.*) He also came to her house on three occasions in the spring of 2004, only once with permission. (DE 39-2 at 4.) Zajac alleges that Qualkenbush continued to harass her "on at least a weekly basis" until she was transferred out of the Plate Mill on October 3, 2005. (*See* DE 41-1 at 3.) The parties agree that Zajac did not report it to ISG until at least July 2005, and possibly even as late as September 2005. (DE 39-2 at 3; DE 41-1 at 3.) She did, however, complain to union officials about the harassment. (*See* DE 41-1 at 3.) And the union tried to prevent future harassment by moving Zajac away from Qualkenbush's crew, but it was generally unable to stop his harassment. (*See id.* at 3-4.)

In the summer of 2005, Zajac left for a vacation after a fight with Qualkenbush. Upon returning on August 8, she noticed the word "bitch" written on her locker and "welcome back princess don't work to [sic] hard" on a dumpster. (DE 38-3 at 2.) Sick of enduring the harassment, Zajac bid to move out of the Plate Mill on August 29. (DE 39-2 at 3.)

Shortly thereafter, Zajac was sexually harassed by another co-worker, Bobby Taylor. (*See* DE 41-1 at 4.) On September 15, 2005, Zajac encountered Taylor in a breakroom. (*Id.*) Taylor prevented Zajac from leaving the room and then said "Good, [another co-worker Joe Brinkman is] not here. Now I can molest you." (*Id.*) Taylor then backed Zajac into a corner and grabbed her arms and breasts. (*Id.*) Zajac claims she had similar encounters with Taylor "on multiple occasions" prior to September 15. (*Id.*) After the breakroom incident, Zajac saw Taylor drive by her house, which, understandably, frightened her. (*See* DE 41-4 at 14.)

Zajac continued to complain to union officials about both men. (*See* DE 41-1 at 5.) But, the complaints had no effect. Finally, on September 27, Zajac reported the breakroom incident to the Burns Harbor Police. (*Id.*) She then obtained protective orders against both Taylor and

Qualkenbush from the La Porte County Court on October 7. (*Id*.)

Zajac did not inform ISG about her police report. Rather, ISG learned of the report from other sources on September 28. (DE 39-2 at 3.) ISG's Employee Service Coordinator, Adrienne Lenoir, then approached Zajac on September 29. (*Id*. at 4.) At that time, Zajac told Lenoir about her history of problems with Qualkenbush and Taylor. (*Id*.) Zajac met with ISG personnel again on October 4. (*Id*. at 5.)

ISG officials and union representatives met with Qualkenbush and Taylor (separately) on October 6. (*Id*. at 6.) The company informed both that they had violated the harassment policy and plant rules. (*Id*.) But the sum total of ISG's discipline was to force the two men to sign a "Last Chance Agreement," which essentially said they could not harass Zajac anymore or attempt to retaliate against her. (*Id*.) Both accepted the agreement, (*id*. at 6-7), and there was no further discipline.

Zajac began working in the Hot Mill on October 3, 2005. (*Id*. at 3.) After a little while in the Hot Mill, she started working in the Hot Mill's banding area and quickly encountered new problems. (*Id*. at 7.) In particular, she was informed by her supervisor that she needed to meet certain training deadlines. (*See* DE 38-3 at 5.) But the trainer assigned to her, Willie Brown, was anything but helpful - it seems he preferred to sleep on the job rather than train her. (*See* DE 39-2 at 7-8.) Nevertheless, her supervisor came down fairly hard on her when she reported her training problems. (*Id*.) On January 5, 2006, Zajac complained to a Division Manager, John Fabina, and requested a transfer to yet another area of the Burns Harbor facility, the Slab Yard. (*Id*. at 8.) Fabina then met with Zajac's supervisors and directed them to ensure that all employees were receiving proper training. (*Id*.) Zajac came to Fabina again the next day,

complaining that her supervisor was yelling at her and she informed him that she was still not sufficiently trained.  (*Id*.)  She identified specific duties she felt she was unable to perform, and ISG gave her precise instructions about how to enhance those skills.  (*Id*. at 8-9.)  In addition, ISG personnel told Zajac that they would try to do a better job of training her.  (*Id*. at 9.)  Again, Zajac requested a transfer to the Slab Yard.  (*Id*.)  Zajac again complained about her training on January 12 and 16.  (*Id*.)  And she again requested a transfer to the Slab Yard on January 9.  (*Id*.)  Around this time, her supervisor, Brian Warnock, suggested accommodations, such as providing extra scrap on which Zajac could practice, in order to assist her training.  (*Id*.)

During this period, Zajac became physically ill from the stress she felt at work.  (*See id*. at 10; *see also* DE 41-1 at 6.)  On January 17, a union representative approached Warnock and informed him that Zajac was sick and that she felt she was working in a hostile work environment.  (DE 39-2 at 10.)  He also told Warnock that Zajac and another employee, Glen Moore (a Slab Yard worker), wanted to meet with him.  (*Id*.)  Warnock agreed to meet with Zajac and the union representative, but informed them that he would not allow Moore to join them because he was not an authorized union representative.  (*Id*.)  That did not satisfy Zajac, who refused the meeting entirely.  (*Id*.)  At the suggestion of her doctor, Zajac went on sick leave that day.  (*Id*.; *see also* DE 41-1 at 6.)

On February 16, 2006, Zajac filed an EEOC charge.  (*See* DE 17 ¶19; DE 38-2 at 8; DE 38-3 at 1.)  Zajac attached a six-page affidavit to her EEOC charge, detailing the experiences discussed above.  (DE 38-3.)  She alleged, among other things, that the training difficulties she encountered in the Hot Mill were a form of retaliation against her because of her complaints about Qualkenbush and Taylor.  (DE 38-2 at 8.)

But that's not the end of the story. On May 8, while still on sick leave, Zajac met with ISG and union officials. (DE 39-2 at 10-11.) She informed them that she did not want to return to the Hot Mill, but instead wanted to be transferred to the Slab Yard. (*Id*. at 11.) Apparently, Zajac had friends in that area and she believed it would be a better work environment for her. (*Id*.) ISG agreed to the transfer, but before Zajac returned to work, Lenoir interviewed her about the problems in the Hot Mill. (*Id*.)

Zajac began working in the Slab Yard on May 28, 2006. (*Id*. at 12.) Unfortunately, things were not what she had hoped. She started in the Slab Yard as a Grade 1 utility person, training in various tasks. (*Id*.) After her training period, she was given a permanent position in the Slab Yard on August 6, and was then assigned to start training on the 501/502 crane. (*Id*.)

As with the training in the Hot Mill, the training on the 501/502 crane did not go well. (*Id*. at 14.) On August 30, 2006, a union representative informed Zajac's supervisor, John King, that Zajac felt King was putting too much pressure on her regarding her training. (*Id*.) King tried to meet with Zajac, but she already left for the day. (*Id*.) He then tried to set up a meeting with Zajac and union representatives for the next day, but she call off from work. (*Id*.)

Even though Zajac did not come to work on August 31, King still met with two union representatives. (*Id*. at 15-16.) At that meeting, the union representatives informed King that they had heard rumors that Zajac told others that she had been having violent dreams about killing people at the plant. (*Id*.) Two other employees confirmed to King that those rumors were swirling around the plant. (*Id*. at 16.) They informed King that Zajac had told them that she dreamed that Glen Moore "lured King into the woods and that [Zajac], while waiting in the tree with a rifle, shot King and then laughed in King's face while he was dying." (*Id*.) Zajac also

relayed similarly gruesome dreams about killing other people working in the plant, too.  (*Id.*)

King informed Lenoir about these rumors, and Lenoir then met with Zajac and a union official.

(*Id.*)  At that meeting, Lenoir told Zajac not to discuss violence at work and provided her with a

copy of the company's harassment policy.  (*Id.*)  Zajac was not otherwise disciplined.  (*Id.*)

On September 1, Zajac's trainer reported to King that Zajac was unable to operate the

501/502 crane.  (*Id.* at 14.)  King prescribed additional training time and assigned her the best

craneman and trainer.  (*Id.*)  The move apparently worked, and on September 19, Zajac passed

her field tests.  (*Id.*)

Around this time, Zajac expressed her interest in shifting to the 504 crane, where a

position was open.  (*Id.* at 12-13; *see also* DE 41-1 at 7.)  Zajac believed she was qualified to

work on the 504, and she was the only person to bid for the job, (*see* DE 41-1 at 7), but King

refused to assign her to it, (*see id.*; *see also* DE 39-2 at 12-13).  There is no difference in pay or

status between the 504 and 501/502, and the supervisor typically chooses where to place

employees based on his assessment of the company's needs.  (DE 39-2 at 13.)[2]  King decided

Zajac had to complete her training on the 501/502 crane and work that job for two weeks before

she could move to the 504.  (*Id.* at 12-13.)  That's because the company wants to ensure that

there is a sufficient number of 501/502-trained employees in the event of manpower fluctuations.

(*Id.* at 13.)  However, King encouraged another employee - in Zajac's presence - to bid for the

504 position, even though that employee had less seniority than Zajac.  (DE 41-1 at 7.)  About

two weeks later, King assigned Zajac to the 504 crane, (*id.*), approximately one month after she

---

[2]  Both the 501/502 and the 504 crane operator positions are Grade 2 positions.  (DE 39-2 at 13.)  Under the Company/Union Line of Progression Rules for Permanent Vacancies, Zajac could be assigned to any Grade 2, seniority need not be considered; no Grade 2 employee has a right to select their assignments.  (*Id.*)

was initially assigned to the 501/502 crane, (DE 39-2 at 15). But King later observed Zajac operating the 504 and was concerned about her performance. (*Id*.)

On October 2, 2006, Zajac filed her second charge of discrimination with the EEOC. (*See* DE 17 ¶27; *see also* DE 38-4.) Zajac's affidavit accompanying the second charge alleges that she continued to endure harassment. (*See* DE 38-4 at 1.) Specifically, Zajac asserted:

> Since the filing of [the first EEOC charge], I have been subjected to continued harassment at work by my superiors. I have also been harassed by my peers/co-employees at work, and my superiors have failed and/or refused to stop these actions, despite me reporting these circumstances to them.

(*Id*.) Zajac also alleged that she was the victim of retaliation by ISG for filing the first charge. (*Id*.) She specifically noted two instances: King's refusal to assign her to the 504 crane and his report to Lenoir about the rumors concerning Zajac's violent dreams. (*See id*. at 1-2.)

Zajac claims to have been the target of other types of harassment while in the Slab Yard, too. (*See* DE 41-1 at 7.) On October 24, Zajac was not feeling well and decided to rest in a shanty on the Slab Yard. (*See* DE 39-2 at 15.) While she was sleeping in the shanty, a co-worker parked a crane in front of the shanty, preventing Zajac from being able to get out. (*Id*.) In addition, Zajac sometimes found graffiti on the walls and lockers saying "69AK9." (DE 41-1 at 7.)[3] Zajac believes that the 69AK9 is a reference to her vanity license plate, which reads "K9B4MEN." (*See id*.) Zajac reported the graffiti to King, who immediately reported it to Lenoir, painted over it, and posted warnings throughout the Slab Yard warning against such conduct. (*See* DE 39-2 at 17.) He also held meetings with the crews regarding the graffiti. (*Id*.) Zajac also arrived at work on three separate days in early November to find that someone had

---

[3] Zajac also contends that she found the word "bitch" on the walls as well, but there is no support for that assertion in the portion of the record she cites. (*See id*.)

tampered with her crane. (*Id.*; *see also* DE 41-1 at 7-8.) The tampering included removing the crane's heater, leaving the heater turned up to high, and covering the controls and seat in grease. (*See* DE 39-2 at 17; *see also* DE 41-1 at 7-8.) Zajac believes these were hostilities directed at her, (*see* DE 41-1 at 7-8), but ISG suggests that they may have been innocuous oversights by the millrights who maintain the cranes, (*see* DE 39-2 at 17). Lastly, Zajac asserts that during her time in the Slab Yard, her co-workers mockingly manipulated the posted schedule. (DE 41-1 at 8.) For example, her name was often crossed out or inserted in other places. (*Id.*)

As with her problems in the Hot Mill, these events took their physical and emotional toll on Zajac. She was often sick and unable to go to work. (*Id.*) But when she tried to call in sick, ISG would not allow it, refusing to accept her doctor's notes. (*Id.*)

On November 9, King met with Zajac and a union representative to discuss her training on the 504. (DE 39-2 at 15.) According to ISG, Zajac informed the company that she did not feel she could operate the 504 and requested to be transferred to a utility position in the Hot Mill Proper. (*Id.* at 15 & 17-18.) Zajac, on the other hand, asserts that King informed her that he believed the only way to get her away from her problems in the Slab Yard was to move to a different position, and she agreed. (*See* DE 41-1 at 8.) She was then transferred to a utility unit, which entailed a reduction her job class and a pay cut. (*Id.*)

Zajac filed this action in the La Porte Superior Court on December 29, 2006, (DE 1), and it was removed here by the Defendants, (DE 2). Her amended complaint, (DE 17), asserts that she has been the victim of sexual harassment by her co-workers. It also asserts that, instead of remedying the harassment complained of in the first EEOC charge, Zajac's co-workers and superiors have retaliated against her for filing the first charge. In addition, it contends that Zajac

has been retaliated against as described in the second EEOC charge, and specifically refers to her loss of job status arising out of her transfer from the Slab Yard. Zajac seeks, among other things, compensatory and punitive damages against ISG.

ISG has moved for summary judgment. (DE 38.) ISG contends that Zajac has not made out a prima facie case of discrimination. In addition, it argues that Zajac has not complied with the time limits for filing her charge with the EEOC with respect to the events concerning Qualkenbush and that the amended complaint otherwise exceeds the scope of the two EEOC charges. (*See* DE 39.) ISG has also filed a motion to strike portions of the affidavit attached to Zajac's response, which attempts to provide factual support for her amended complaint. (*See* DE 43.) Zajac did not respond to the motion to strike.

## DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 433 (7th Cir. 1994).

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv.*, *Inc.*, 169 F.3d 494, 497 (7th Cir. 1999). But the nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and brackets omitted). The non-moving

party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). It must do so with admissible evidence; it cannot rest upon mere allegations in the pleadings or conclusory statements in affidavits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). It must do so "with reasonable particularity," *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997) (quotation marks omitted), because it is not the Court's job to "scour the record to locate evidence supporting a party's legal argument," *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005).

But before I delve into the substantive analysis I must tackle two preliminary questions. First, I must decide whether the statements contained in Zajac's affidavit, (DE 41-2), can be considered on summary judgment. Second, I must determine whether Zajac has met the notice requirements in Title VII.

## I.      ISG'S MOTION TO STRIKE ZAJAC'S AFFIDAVIT

A party cannot survive a motion for summary judgment with sham factual issues; the evidence relied upon by the nonmoving party "must be competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "On a motion for summary judgment, a court must not consider those parts of an affidavit that are insufficient under [Federal Rule of Civil Procedure] 56(e)." *Adusumilli v. City of Chi.*, 164 F.3d 353, 359 (7th Cir. 1998). *See also Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861-62 (7th Cir. 1985). A party cannot create an issue by submitting an affidavit that contains statements that contradict the affiant's prior testimony. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008).

Contradictory statements are only allowed in limited circumstances, such as where they clarify ambiguous or confusing testimony or when based on newly discovered evidence. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1171-72 (7th Cir. 1996). These restrictions are not just "a technicality," but are important tools used to achieve the goals of summary judgment. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

ISG argues several paragraphs in Zajac's affidavit are insufficient under Rule 56(e), (*see* DE 43 & 44), but I need address only one. ISG argues that paragraph 13 must be stricken. (*See* DE 43 ¶5(c).) Paragraph 13 contains two statements: (1) that before Zajac was moved off of Qualkenbush's crew, "Joe Brinkman, reported to me that Carl Qualkenbush had bragged that he (Carl Qualkenbush) was stalking me at work," and (2) that Zajac "immediately reported this information to Adrienne Lenoir of ISG Human Resources and her response to [Zajac] was, 'Did you see him?' She took no further action." (DE 41-2 ¶13.) ISG contends that these statements contain inadmissible hearsay. To the extent that the first statement is being offered for the truth of the matters asserted therein - *i.e.*, that Qualkenbush made this statement to Brinkman and that Brinkman relayed it to Zajac - it is inadmissible hearsay under Rules 801 and 802. This statement may be admissible, however, as evidence of Zajac's mental state upon hearing the information under Rule 803(3). *See Cooper-Schut*, 361 F.3d at 430. I must therefore limit my use of that evidence. With respect to the timing of events in paragraph 13, that testimony contradicts Zajac's prior sworn testimony from her deposition, which unambiguously states that these events happened after she obtained the restraining order, which was after she transferred away from Qualkenbush's crew. (*See* DE 41-4 at 46.) Zajac offers no explanation for this change. Therefore that portion of the affidavit is stricken as conflicting with the deposition. *See*

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). Other than that, however, ISG's motion to strike is denied.

## II.   300 DAY EEOC FILING DEADLINE

The second preliminary issue I must address is the timeliness of Zajac's EEOC charges. Section 2000e-5(e)(1) of Title 42 provides that a person aggrieved under Title VII must file a charge with the EEOC within 180 or 300 days of the offending practice, depending on the state. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2166-67 (2007); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002). In Indiana, the charge must be filed within 300 days of the unlawful practice. *See R.R. Donnelly*, 42 F.3d at 445. A complaint based upon a charge that was filed more than 300 days after the unlawful practice is time-barred and the plaintiff may not recover. *See Bannon v. Univ. of Chi.*, 503 F.3d 623, 628 (7th Cir. 2007). This is true "even when [the time-barred acts] are related to acts alleged in timely filed charges," because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Roney v. Ill. Dept. of Trans.*, 474 F.3d 455, 460 (7th Cir. 2007) (quotation marks omitted).

ISG argues that Zajac's claims regarding Qualkenbush's sexual harassment are time-barred because she did not file her EEOC charge within the 300 days of those events. (*See* 39-1 at 6-7.) Because Zajac alleges that Qualkenbush's offensive conduct occurred between November 2004 and February 14, 2005, the company claims that she was obliged to file her charge by September 2, 2005. (*Id*. at 6.) If those acts were all that Zajac was relying on, then ISG would be correct since "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within . . . 300 days of the date of the

act or lose the ability to recover for it." *Morgan*, 536 U.S. at 110.

But ISG's characterization of Zajac's claim is much too narrow. Zajac is asserting that Qualkenbush's conduct was a component of the hostile work environment that was pervasive at ISG. (*See* DE 41-1 at 17.) Under *Morgan*, a hostile work environment is one unlawful employment practice that is composed of a series of events occurring over a series of days or even years. *Morgan*, 536 U.S. at 115; *see also Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008). In proving a hostile work environment claim, a plaintiff may rely upon events that happened outside of the 300-day limit, so long as one of the acts contributing to the hostile work environment occurred within the period. *See Morgan*, 536 U.S. at 117. *See also Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007).

ISG argues that Zajac's claims should be separated based on where she was working in the plant (Plate Mill, Hot Mill, and Slab Yard), and doing so makes her complaints regarding Qualkenbush untimely. (*See* DE 42 at 2.) But because a hostile work environment claim is a claim against the company as a whole for allowing the environment, it cannot be fragmented into the various areas of the plant so long as the same company officials are in charge of the environment. *See Bright*, 510 F.3d at 768; *Isaacs*, 485 F.3d at 386.

In this case, it appears that ISG was aware of Zajac's difficulties in each of the areas and therefore it may be appropriate to hold the company liable for one hostile work environment that spread across each of the areas Zajac worked. At a minimum, the graffiti Zajac encountered after her fight with Qualkenbush in August 2005 appears to be a concrete example of the pervasive hostile work environment that Zajac complained about in her first EEOC charge.

Because the hostilities Zajac endured continued until at least August 2005, her hostile work environment claim is timely and can include reference to Qualkenbush's harassment from 2004 on.

## III. ZAJAC'S TITLE VII CLAIMS

### A. Zajac's Harassment Claim

To establish a prima facie case, Zajac must demonstrate that she was (1) subjected to unwelcome harassment; (2) because of her sex; (3) that was severe or pervasive enough to alter the condition of her employment and create a hostile work environment; and (4) that there is a basis for employer liability. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). *See also Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). "[T]here is no magic number of incidents required to establish a hostile environment," *Boumehdi*, 489 F.3d at 789, and the environment must be both subjectively and objectively offensive, *see Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). While the environment need not be "hellish," *id.* at 500, it does need to be "extreme," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

An employer can only be held liable under Title VII if it is responsible for the hostile work environment. Under the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher*, 524 U.S. 775, that means an employer can be liable for the actions of co-workers (as opposed to supervisors) only where it is shown that the employer was negligent in discovering or remedying the harassment. *See Bright*, 510 F.3d at 770. *See also Cooper-Schut*, 361 F.3d at 426. "An employer satisfies its legal duty in coworker harassment cases if it takes reasonable steps to discover and rectify acts of . . . harassment of its

employees." *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (quotation marks and citations omitted). But the ultimate inquiry is whether the employer "responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." *See Lapka*, 517 F.3d at 984-85.

Zajac has provided sufficient evidence to survive summary judgment on her harassment claim. Indeed, there are at least two sets of facts that allow Zajac's harassment claim to clear summary judgment. Specifically, a reasonable fact-finder could find that Zajac was subjected to severe or pervasive harassment in both the Plate Mill and the Slab Yard because of her sex and that ISG's response was inadequate.

I start with the Plate Mill. There is little dispute about whether Qualkenbush and Taylor sexually harassed Zajac. There is no argument that Zajac was not subjected to unwelcome harassment because of her sex that was severe enough to alter the condition of her employment or create a hostile work environment. Rather, ISG confines its position to arguing that Zajac's charge was filed outside the 300 day limit, that she failed to notify ISG of the harassment until September 2005, and that when ISG became aware of the harassment, it acted swiftly to address it. I have already addressed the first point. With regard to the second, ISG maintained anti-harassment policies and rules, and it even conducted sexual harassment training in the middle of these events. Those policies provided a mechanism by which Zajac should have informed ISG of the harassment, and the admissible evidence indicates she failed to do so until September 2005. Therefore, the company cannot be liable for not remedying the environment prior to that time. *See Durkin v. City of Chi.*, 341 F.3d 606, 612 (7th Cir. 2003). *See also Faragher*, 524 U.S. at 806-07; *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 356-57 (7th Cir. 2002); *Parkins v. Civil*

*Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998).

Still, when ISG found out about the harassment, its response was not exactly iron-fisted, and on the record before me I question its reasonableness. ISG started off on the right foot: after learning of Zajac's police report concerning one of her co-workers, it approached Zajac to investigate the matter. This sort of pro-active investigation is commendable and can even be enough to avoid liability in some cases. *See Cerros*, 398 F.3d at 953-54 (noting that "prompt investigation of alleged misconduct [is the] hallmark of reasonable corrective action"); *Cooper-Schut*, 361 F.3d at 427 (even though no discipline was meted out, the company's prompt investigation was not a negligent response). But the wheels may have come off when it came to disciplining Qualkenbush and Taylor. Confronted with one employee who had engaged in a year-long pattern of harassment and another who physically assaulted a co-worker at the worksite, the company's response was to tell them not to do it again. It seems ISG figured that because Zajac was transferring to a different area of the mill anyway, the problem would just go away. While transferring a victim of sexual harassment may be a reasonable response in some circumstances, *see, e.g.*, *Phelan v. Cook County*, 463 F.3d 773, 785 (7th Cir. 2006), I think there is a genuine issue about whether it was reasonable here. ISG needed to respond in a way that was reasonably calculated to alleviate a hostile work environment even if Zajac was no longer there. Because it only gave Qualkenbush and Taylor a slap on the wrist, I am left with questions about its sufficiency. *See, e.g.*, *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999) ("Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care.").

At oral argument, ISG suggested that its response was reasonable given the practical constraints of dealing with the union to which Qualkenbush and Taylor belong. In other words, there wasn't much more that ISG could do given the constraints of the collective bargaining agreement. The problem is that I haven't really been given any details regarding what those constraints are. Instead, all I have are ambiguous assertions ISG made at oral argument about running into union problems. That's not enough on summary judgment.

There is also sufficient evidence of harassment in the Slab Yard. According to her response brief, Zajac was subjected to quite a lot while she worked in the Slab Yard:

> On a daily basis in the Slab Yard, Zajac endured sexual and other harassment. Daily, Zajac came to work to find obscenities and sexually explicit slogans, such as "bitch" and "69AK-9" (a reference to Zajac's vanity license plate which reads "K9B4MEN," as a tribute to her dogs). . . . Daily, Zajac reported to work and found the knobs in the crane she ran greased, grease in the seat, the seat thrown out of the crane and the heater thrown out of the crane. . . . Daily, Zajac would find her name crossed off of the work schedule, moved around on the work schedule by being crossed out and inserted elsewhere. . . . Each time, Zajac reported these incidents to her supervisor or foreman. . . . The harassment was so severe that it made Zajac physically ill but when she called off of work for health reasons, ISG refused to accept her doctor's notes and threatened her with write-ups and unpaid time off of work. . . .
> The harassment was so severe that Zajac [w]as told by her supervisor, John King, that the only way to stop it or that she could only get away from it was if he disqualified her on the crane and moved her back to the utility unit, resulting in a loss of job class and a pay cut.

(DE 41-1 at 7-8. (citations omitted).)

These facts are sufficient to survive summary judgment. They provide basis for a reasonable fact finder to determine that Zajac was subjected to unwelcome harassment, and that it was pervasive enough to create a hostile work environment.

The main sticking point is whether there is enough evidence to find that the harassment was based on Zajac's sex. As noted above, there is no evidentiary support that the word "bitch"

actually appeared on the walls or lockers during this time. (*See supra* at n.3.) But there is evidence that "69AK9" did appear. While the company took quick action to remedy the graffiti, it is nevertheless relevant to my analysis of whether the co-worker harassment was based on Zajac's sex. And because of sexual nature of the graffiti, I must infer it was. *See Haefling*, 169 F.3d at 497. Indeed, I find that it provides a basis to infer that all of the harassment Zajac endured at the hands of her co-workers was based on her sex.

The remaining question is whether there is a basis for employer liability that is sufficient to survive summary judgment. On the record before me, I find there is. While ISG took swift action regarding the graffiti, (*see* DE 39-2 at 17), that is not the only example of the co-worker harassment. And other than the graffiti incident, the evidence before me indicates that ISG was unable to control Zajac's co-workers. In fact, there is even evidence that King acknowledged ISG's lack of control and said that the only way for Zajac to get away from the harassment would be to disqualify her from the 504, resulting in a pay cut. (*See* DE 41-4 at 18.) Thus, there is sufficient evidence for a reasonable fact-finder to determine that there is a basis for employer liability.

ISG's primary argument regarding the events in the Slab Yard is that Zajac did not include them in her hostile work environment claim. (*See* DE 39-1 at 20; DE 42 at 12.) But that is incorrect. First, the affidavit attached to Zajac's second EEOC charge specifically alleged that she had been "subjected to continued harassment at work by [her] superiors" and that she has "also been harassed by [her] peers/co-employees at work, and [her] superiors have failed and/or refused to stop these actions." (DE 38-4 at 1.) She then goes on to discuss her retaliation claims. (*Id.*) In evaluating the scope of the EEOC charge, courts generally apply a "liberal standard"

because they are not typically drafted by trained counsel, and courts consider statements in a sworn affidavit attached to the charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994). *See also* 29 C.F.R. § 1601.12(b). Viewing the EEOC charge and affidavit from that perspective, the alleged continued harassment is distinct from her retaliation claim, and because the events in the Slab Yard appear to be "reasonably related" to the continued harassment allegations, they are not barred. *See Gawley v. Ind.Univ.*, 276 F.3d 301, 313 (7th Cir. 2001). Second, Zajac's amended complaint alleges that the harassment she has endured "continues to the present day," which includes the Slab Yard. (DE 17 ¶30.) Finally, Zajac's response brief specifically argues that the events in the Slab Yard are part of her hostile work environment claim. (*See* DE 41-1 at 13-14.)

Consequently, I find that there are genuine issues of material fact regarding Zajac's hostile work environment claim. Those issues include, but are not limited to, whether ISG's responses to the Qualkenbush and Taylor harassment and to the Slab Yard co-worker harassment were reasonable.

### B. Zajac's Retaliation Claims

Zajac also alleges that the company retaliated against her for complaining about the harassment she endured. Section 2000e-3(a) prohibits an employer from retaliating against an employee for opposing any practice that is made unlawful by Title VII. *See Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006); *see also Lapka*, 517 F.3d at 985-86. Under the direct method, Zajac must (1) offer evidence that she engaged in a statutorily protected activity; (2) was subjected to an adverse employment action; and (3) that a causal connection exists between the two events. *See Argyropoulos*, 539 F.3d at 733. *See also Lapka*, 517 F.3d at

985-86; *Boumehdi*, 489 F.3d at 792.[4]

Zajac's amended complaint specifies several actions she believes to be retaliatory, (*see* DE 17 ¶¶25 & 29), but she distills her retaliation claim down to three actions in her response brief, (*see* 41-1 at 19-20), and she narrowed it even more at oral argument. The three she mentions in the response are: (1) King's refusal to assign her to the 504 crane; (2) King's encouraging another employee with less seniority than Zajac to bid for the 504 crane job; and (3) her "co-workers' retaliat[ion]," which led to King allegedly telling Zajac that the only way she could get away from the situation was to transfer to a different area and take a pay cut. (*Id.*) At oral argument, Zajac again confined her position, asserting that "the 504 crane issue" was the crux of the retaliation claim. The other claims Zajac raised in her EEOC charges and her complaints are waived.

Before getting to the merits of the retaliation claim, there is a preliminary issue to decide relating to whether Zajac's claims exceed the scope of her EEOC charges and therefore do not provide a basis for relief. (*See* DE 42 at 12-13.) Zajac "may bring only those claims that were included in her . . . EEOC charge[s], or that are like or reasonably related to the allegations" in those charges. *Gawley*, 276 F.3d at 313. In order to provide the EEOC and the employer an opportunity to resolve the matter prior to filing a complaint, the Seventh Circuit requires that "the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." *Id.* at 313-14. *See also Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995); *Cheek*, 31 F.3d at 500-01. And, as noted above, I am to apply a "liberal

---

[4] Zajac's argument appears to be under the direct method, although it is not entirely clear. But since she does not discuss the elements of the indirect method in her brief – for example, there is no discussion of similarly-situated employees – I only analyze her retaliation claim under the direct method.

standard" in my analysis of the EEOC charge and affidavit.  *See id*. at 502.

Applying that standard, I find the actions Zajac relies upon in her response brief could reasonably "be expected to grow out of an EEOC investigation of the charges" she filed. *Harper*, 45 F.3d at 148.  Therefore, if they otherwise satisfy the requirements of a Title VII retaliation claim, they are not barred by failure to exhaust administrative remedies.

As for the merits of the claim, there can be no doubt that Zajac engaged in protected activity: once she complained to ISG about Qualkenbush's and Taylor's harassment, she regularly complained to ISG personnel about her employment conditions.  But she cannot establish the other two requirements for showing unlawful retaliation.  Specifically, she cannot demonstrate that any of the three acts described in her response brief are both adverse employment actions and were connected to her harassment complaints.

The Seventh Circuit defines adverse employment actions broadly, *see Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001), and does not limit it "to those [actions] that affect the terms and conditions of one's employment," *Roney*, 474 F.3d at 461.  But adverse employment actions must still "be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* *See also White*, 548 U.S. at 67-68.  The action must be material, meaning that an employee's harassment complaint "cannot immunize [her] from those petty slights or minor annoyances that often take place at work." *Id*. at 68.  In addition, the action must be sufficient to affect a reasonable employee, not just the plaintiff. *Id*. at 68-69.[5]

---

[5] Zajac's response brief argues that *she* should be a sufficient signal of the response of a reasonable employee. (*See* DE 41-1 at 20 (arguing that her "co-workers' retaliatory [conduct] was sufficiently severe as to dissuade a reasonable worker (Zajac) from making a supporting charge of discrimination").)  This simply supplants the objective standard with a subjective one,

With respect to the causal connection requirement, Zajac must demonstrate that her complaints were "a substantial or motivating factor" in the action against her. *Gates*, 513 F.3d at 686 (quotation marks omitted). Some cases analyze the causal connection in terms of a "but for" showing. *See Adusumilli*, 164 F.3d at 363. Others have noted that a close temporal connection, especially when combined with other circumstances, is sufficient. *See Billow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001). *See also Phelan*, 463 F.3d at 788 (noting that the passing of only 72 hours between the protected activity and the plaintiff's termination was sufficient). Like most things, whether there is a connection largely depends on the facts of the case.

Zajac's retaliation claim is fairly ambiguous. Here is the sum total of what Zajac said in the retaliation section of her response brief:

> ISG argues that it should not be found to have committed retaliation against Zajac for filing her first Charge of Discrimination. However, no other plausible explanation exists for the failure and/or refusal of Zajac's supervisor to place her in the 504 crane operator position when she had passed and qualified on the 501/502 crane, possessed the necessary skill to run the 504 crane and was the only person to bid for the job. No other explanation exists for Zaj[a]c's supervisor to encourage another employee to take the position, in Zajac's presence, when that employee had less seniority than Zajac. No other explanation exists for placing Zajac in the 504 crane two (2) weeks after her request was originally denied when she did not receive any additional training and none was required.
> Furthermore, Zajac can meet the elements of the <u>Hawkins</u> test. Zajac did not file a third or fourth charge of discrimination; instead, she went on sick leave to escape the harassment at work. Thus, the co-workers' retaliatory [conduct] was sufficiently severe so as to dissuade a reasonable worker (Zajac) from making a supporting charge of discrimination.
> Second, the supervisor clearly had knowledge of the continuing harassment because he (John King) was the person who told Zajac that the only way to get her away from it was to disqualify her on the crane and send her back to the utility unit, resulting in loss of a job scale and a pay cut. The harassment

---

and it is not enough to satisfy the reasonable person requirement.

did not stop, but the victim was moved, once again. And third, if the supervisors did not stop the harassment, which they clearly did not, then it can only be said that they tolerated it and/or responded to Zajac's complaints so inadequately that their response manifested indifference or unreasonableness under the circumstances. In short, the responses, if any, were not sufficient enough to deter the co-workers from continuing the harassment or fearing the consequences. In fact, there were no consequences for anyone except Patricia Zajac.

(DE 41-1 at 19-20.) And as noted above, Zajac further confined her retaliation position at oral argument.

The first two allegedly retaliatory actions - King's refusal to assign Zajac to the 504 crane and his encouraging another employee with less seniority to bid for the job - do not meet either requirement. They are not adverse employment actions. "The employee doesn't get to write [her] own job description." *Palucki*, 879 F.2d at 1571. Once Zajac entered the Slab Yard as a Class 2 employee, she was subject to being placed in any Class 2 position. (*See* DE 42 at 13-14.) On the evidence before me, there is no legally significant difference between the 504 crane and the 501/502 crane – and Zajac's mere preference between the two certainly does not carry the day. King is allowed to balance his workforce needs. (*See id.*) What is more, King went out of his way to ensure that Zajac received the training she needed on the 501/502 crane, (*see* DE 39-2 at 14-15), and eventually assigned her to the 504 as she requested. The delay between her request and his assignment is not sufficient to demonstrate an adverse employment action. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (noting that a one month delay in transfer is not an adverse employment action and that "mere unhappiness and inconvenience are not actionable under Title VII").

More importantly, Zajac points to absolutely zero evidence indicating there was any link whatsoever between King's decision and Zajac's prior harassment complaints. There is no

evidence King held any animosity toward Zajac. Indeed, the evidence suggests that King was flexible and considerate in dealing with her. (*See* DE 39-2 at 14-15.) While it might not be tactful to encourage a co-worker to bid for a job the supervisor knows another employee wants in front of that employee, nothing indicates King had a retaliatory motive in doing so. Zajac's assertions that there must be some connection are merely speculation, which is not enough to survive summary judgment.

The remaining action - which I interpret to be ISG's tolerance of retaliation by Zajac's co-workers - is also legally insufficient to demonstrate retaliation. Harassment by co-workers can rise to the level of a Title VII retaliation claim. *See Stutler*, 263 F.3d at 703-04. But that is not the case here. First, Zajac does not clearly articulate what co-worker harassment was retaliatory. She claims that the retaliation was so severe that she went on sick leave rather than file a third or fourth charge of discrimination. (*See* DE 41-1 at 20.) The problem is, according to the record before me, Zajac went on sick leave only once, and that was <u>before</u> she filed the <u>first</u> EEOC charge. So I am left to wonder what the harassment is that Zajac is relying upon. Second, and more importantly, Zajac points to no evidence suggesting that any of her co-workers' alleged harassment was motivated by her earlier complaints about sexual harassment. That is an essential element of her claim, and the lack of evidence to support it is glaring and fatal. *See Gates*, 513 F.3d at 686.

On the record before me, there are no genuine issues of material fact regarding Zajac's retaliation claim, and it must fail.

## CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    Defendant ISG Burns Harbor, LLC's Motion to Strike Portions of Plaintiff's Affidavit [DE 43] is **GRANTED IN PART AND DENIED IN PART** as described by this Order; and

2.     Defendant ISG Burns Harbor, LLC's Motion for Summary Judgment [DE 38] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

Entered: November 17, 2008

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT